UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRIS L. CUNNINGHAM, TIMOTHY C. ROSS and ZED MOORE,<br><br>        Plaintiffs,<br><br>   v.<br><br>SNAP-ON TOOLS COMPANY,<br><br>        Defendant. | Case No. 04-cv-4136-JPG |

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendant Snap-on Tools Company's ("Snap-on") motion for summary judgment (Doc. 24). Plaintiffs Chris L. Cunningham ("Cunningham"), Timothy C. Ross ("Ross") and Zed Moore ("Moore") have responded to the motion (Doc. 27), and Snap-on has replied to that response (Doc. 28).

**I.   Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

**II.     Facts**

Construing all the evidence and drawing all reasonable inferences in favor of the plaintiffs, the Court finds that the following facts are established for the purpose of this motion.

     A.     <u>Snap-on's Severance Plan</u>

Until 2004, Snap-on manufactured products at a plant in Mt. Carmel, Illinois, where it employed Cunningham, Ross and Moore. At all relevant times, Snap-on had a severance benefit plan under which all plaintiffs were eligible to be covered as "exempt employees." Each plaintiff was given a written summary plan description ("Plan") when they were hired. The Plan stated, in pertinent part,

> The purpose of this Plan is to provide a certain level of Severance benefits to a covered employee, whose employment with the Company [Snap-on] is terminated as a result of a covered Separation (see "Definitions" Section). To receive benefits under the Plan, an employee must file a claim for benefits and sign a Severance Benefit Release and Waiver as required by the Company.

Compl. Ex. 2, Plan at SEV-1. The "Definitions" section of the Plan defines "Separation" as

> the termination of the employee's employment with the Company [Snap-on], initiated and directed by the Company for reasons of: the elimination of the employee's position, organizational changes or reductions in the work force, where no generally comparable position is available and offered to the employee. The determination of whether a position is comparable rests in the sole discretion of the Company. Acceptance by the employee of a position with the Company which is not comparable, as determined by the Company, shall not be a Separation.
>
> A Separation does not occur under any other circumstances other than as described above. . . .

*Id.* at SEV-6.

The Plan also states that it "is provided at the discretion of Snap-on Incorporated which reserves the sole discretion and right to interpret and administer Plan provisions. Snap-on Incorporated is the Plan sponsor and administrator." *Id.* at SEV-5.

Each employee was issued a handbook in July 2001 which described the Plan, in pertinent part, as follows:

> These guidelines should be followed with very few, if any, exceptions. Exceptions must be reviewed and approved in advance by your corporate HR contact.
>
> * * *
>
> 2.  Eligible exempt employees will receive one and one-half weeks' compensation for each year or partial year of service when their job is eliminated.

Compl. Ex. 1.

    B.    <u>Plant Closure</u>

On July 21, 2003, Snap-on informed its employees that it would close the Mt. Carmel plant some time in 2004 but did not give specific dates for the closure. More specific information followed on August 15, 2003, when Snap-on notified its employees that terminations would begin around October 15, 2003, and would continue until the plant closed

around March 31, 2004.

To minimize the number of involuntary terminations during the closure period, Snap-on instituted a program where its employees could volunteer to be terminated. Brian Stone ("Stone"), Snap-on's human resources manager, sent the following e-mail to certain employees on September 26, 2003:

> Two week termination notices will be issued to some hourly, exempt, and non-exempt personnel on Friday, October 3rd. If you are interested in voluntary separation, please contact me by Wednesday, October 1st. The purpose of this request is to identify individuals who would prefer to leave the Company and possibly afford other employees the opportunity to stay longer. Employees who request voluntary separation will be considered for termination on October 17th. However, individual requests may be denied based on current/future staffing, job skill and production requirements. All employees terminated on the 17th are entitled to their applicable severance package as well as any other benefits they are entitled to as terminated employees. Please let me know if you have questions or would like to be considered for voluntary termination.

Compl. Ex. 6.

   C. <u>The Plaintiffs</u>

The plaintiffs were not all in the same situation in relation to the plant closure.

     1. <u>Moore</u>

The day after Snap-on first announced in July 2003 that the Mt. Carmel plant would be closing, Jerry Dalton ("Dalton"), Snap-on's Mt. Carmel plant manager, told Moore that his job had been eliminated at the Mt. Carmel plant but that Snap-on would transfer Moore to another Snap-on plant in Elizabethton, Tennessee, to temporarily fill in for an employee on medical leave. On August 29, Moore's supervisor at the Elizabethton Snap-on plant offered Moore a permanent job at that facility. Moore declined the offer, saying he would rather return to work at the Mt. Carmel plant. Moore's temporary assignment ended on September 13, and Moore reported to work at the Mt. Carmel plant on September 26.

4

On the day of his return, Moore requested to be voluntarily terminated pursuant to the terms of Stone's September 26 e-mail because he had received another job offer and wanted to accept it immediately.[1]  Dalton refused to accept Moore's offer of voluntary termination.

Three days later, Moore offered to postpone accepting his job offer elsewhere to remain employed at Snap-on for as long as was necessary to obtain severance benefits.  Dalton told him that he was not eligible for severance benefits because he had been offered employment with another company.

Moore had a separate discussion with Stone, who told him that he was not eligible for severance benefits for voluntary termination because Snap-on needed his services until the plant closure.  Moore's employment with Snap-on ended on October 17.

Moore believes he is entitled to severance benefits because his position at the Mt. Carmel plant was eliminated as early as August 2003.  Alternatively, he believes he is entitled to severance benefits pursuant to the terms of Stone's September 26 e-mail.

2. Ross

On October 1, 2003, Ross met with Stone, but each remembers the meeting differently.  Ross states that he volunteered to accept termination pursuant to Stone's September 26 e-mail, and that Stone told him that his offer would be accepted and that he would receive severance benefits.  However, Stone counseled Ross that voluntary termination was not in his best interests because Ross had not yet obtained other employment and encouraged him not to volunteer for termination.  Stone assured Ross that Snap-on would be providing the voluntary termination

---

[1] The Court notes that Stone's Septembe 26 e-mail was not addressed to Moore. However, since no party has argued that Moore was not presented with the offer to volunteer for termination, the Court assumes that he was so offered.

5

offer throughout the closing of the plant and advised Ross to volunteer for termination at a later time once he had found another job. Ross took Stone's advice and withdrew his offer to be voluntarily terminated. Stone recalls a vastly different meeting. He states that at the October 1 meeting, he informed Ross that his services would be required through the plant closure and that, as a consequence, Snap-on would not accept any offer he might make to accept voluntary termination pursuant to Stone's September 26 e-mail. Because at the summary judgment stage all evidence must be construed in the light most favorable to Ross, the Court must accept his version of the meeting as true.

On October 17, after being offered employment elsewhere, Ross met with Stone and Dalton to verify his eligibility for severance benefits. Dalton told Ross that in two weeks Snap-on would extend the offer to accept volunteers for termination and that it would accept Ross as a volunteer to be terminated at that time and would provide him severance benefits. In reliance on these statements, Ross accepted the offer of employment elsewhere.

Accordingly, on November 8, Ross orally notified Snap-on that he was accepting the offer of voluntary termination Dalton had told him about on October 17 and would stop working in two weeks, on November 24, in order to begin his other employment. Snap-on declined to accept Ross's offer or to give him severance benefits, stating that they needed him to work until the final plant closure.

In February 2004, Ross appealed Snap-on's decision not to award him severance benefits, and in April 2004, the Benefits Committee denied the appeal, noting that Ross's termination was not initiated by Snap-on and did not qualify under the Plan as a "separation" for which severance benefits were warranted.

        3.     <u>Cunningham</u>

On February 18, 2004, Cunningham gave notice that he would resign in two weeks to take a job with another employer. Snap-on informed him that he would not receive severance benefits because he did not stay until the final closure of the Mt. Carmel plant. Neither side has presented additional evidence regarding the circumstances of Cunningham's departure from Snap-on.

    D.     <u>The Litigation</u>

Cunningham, Ross and Moore filed this lawsuit in June 2004 in the Wabash County Circuit Court alleging a claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. (count 1), for "arbitrary, inequitable and discriminatory" administration of the plan in breach of Snap-on's fiduciary duty to the plaintiffs. The plaintiffs also bring a variety of state law claims – breach of contract, promissory estoppel, equitable estoppel, fraud and unjust enrichment (counts 2 through 7). In light of the federal question apparently presented by the ERISA claim, Snap-on removed this case to federal court, where it is now pending.

Snap-on asks the Court to dismiss the state law claims on the grounds that they are preempted by ERISA and to grant summary judgment on the ERISA claim to recover benefits on the grounds that Snap-on's decisions to deny severance benefits were not arbitrary and capricious.

**III.**    **Analysis**

The Court will first examine count 1, then will turn to the preemption question.

    A.     <u>ERISA Claims</u>

Snap-on asks the Court to grant it summary judgment on the grounds that it did not

violate its severance benefit plan when it found that the plaintiffs were not eligible for severance benefits.  It is at this point that the Court runs up against an issue raised by neither party:  the plaintiffs' standing to bring an ERISA claim.  Standing is a jurisdiction issue, and the Court has an independent duty to ensure that it has jurisdiction to hear cases brought before it.  *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994); *see also Cook v. Winfrey*, 141 F.3d 322, 325 (7th Cir. 1998) (citing *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986) ("[O]nce the district judge has reason to believe that there is a serious jurisdictional issue, he is obliged to resolve it before proceeding to the merits even if the defendant, whether as a matter of indolence or strategy, does not press the issue.")).

Before tackling the standing question, a general overview of ERISA is helpful.  ERISA was enacted in 1974 "to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits."  *Massachusetts v. Morash*, 490 U.S. 107, 112-13 (1989) (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987)).  To achieve this goal, ERISA "sets forth reporting and disclosure obligations for plans, imposes a fiduciary standard of care for plan administrators, and establishes schedules for the vesting and accrual of pension benefits."  *Morash*, 490 U.S. at 113.

ERISA covers both welfare benefit plans and pension benefit plans.  29 U.S.C. § 1002(3); *Morash*, 490 U.S. at 113 (citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985)).  No party to this case disputes that severance benefit plans like Snap-on's are considered to be welfare benefit plans and are therefore covered by ERISA.  *Morash*, 490 U.S. at 116; *Panaras v. Liquid Carbonic Indus. Corp.* 74 F.3d 786, 789 (7th Cir. 1996). *UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 510 (7th Cir. 1993); *Young v. Standard Oil (Ind.)*, 849 F.2d 1039, 1045 (7th Cir. 1988);  *see* 29 U.S.C. §§

186(c)(6) & 1002(1).

ERISA authorizes suits only by particular people. For the purposes of this case, the relevant category of people permitted to bring suits are "participants," 29 U.S.C. § 1132(a), which ERISA defines to include "former employee[s] of an employer . . . who [are] or may become eligible to receive a benefit of any type from an employee benefit plan. . . ." 29 U.S.C. § 1002(7). With respect to former employees who believe they are eligible for welfare benefits such as severance pay, a "participant" includes a "former employee who has a colorable claim to benefits which the employer promised to provide pursuant to the employment relationship and which a nonfrivolous argument suggests have accrued to the employee's benefit." *Panaras*, 74 F.3d at 791; *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117-18 (1989) (holding that "participant" includes former employees "who have a colorable claim to vested benefits"). A claim is colorable if it is arguable and not frivolous, although it need not be a successful one. *Panaras*, 74 F.3d at 790 (citing *Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991)).

Because an ERISA plaintiff's standing is related to whether a claim to benefits is frivolous, it is necessary to look at the merits of the plaintiffs' claims to severance benefits to determine the threshold standing question. *See Kamler v. H/N Telecomm. Servs.*, 305 F.3d 672, 678 (7th Cir. 2002), *cert. denied* 538 U.S. 946 (2003); *Sallee v. Rexnord Corp.*, 985 F.2d 927, 930 (7th Cir. 1993). The first step in reviewing the merits of the plaintiffs' claims to severance benefits is to determine the proper standard of review. If a plan governed by ERISA gives the plan administrator discretion to interpret the plan terms or determine benefits eligibility, the Court reviews the administrator's decision under the arbitrary and capricious standard. *Bruch*, 489 U.S. at 115; *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 827 (7th Cir. 2004).

9

Otherwise, the review is *de novo*. *Bruch*, 489 U.S. at 115. In this case, the Plan gives Snap-on "the sole discretion and right to interpret and administer Plan provisions," Compl. Ex. 2, Plan at SEV-5, which is sufficient to justify review under the arbitrary and capricious standard. The ultimate question then is whether Snap-on acted arbitrarily and capriciously in denying severance benefits to the plaintiffs, and the threshold jurisdiction question then is whether the plaintiffs have a non-frivolous argument under that standard of review that they are entitled to severance benefits.

Under the arbitrary and capricious standard, the Court gives great deference to an administrator's decision and will not overturn it unless it was "a downright unreasonable one," even if the Court would have made a different decision had it been administering the plan. *Dabertin*, 373 F.3d at 828 (citing *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999)). To establish that a decision was not arbitrary and capricious, the administrator "must articulate a rational connection between the facts found, the issue to be decided, and the choice made." *Dabertin*, 373 F.3d at 828 (citing *Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1109 (7th Cir. 1998)).

Preliminary to an examination of each plaintiff's particular situation, it would be helpful to take a look at the Plan itself. The Plan states that severance benefits are only available for "separations" as that term is defined under the Plan. Compl. Ex. 2, Plan at SEV-1. Under the Plan, to qualify as a "separation," a termination must be initiated or directed by Snap-on. *Id.* at SEV-6. Further, even if it is initiated or directed by Snap-on, a termination does not qualify as a "separation" if the employee is offered a comparable job at Snap-on or if the employee actually takes another job at Snap-on, regardless of whether it is comparable. *Id.* The Plan is unambiguous on these points.

That the July 2001 handbook material addressing severance benefits does not contain as much specific information about what sort of termination triggers entitlement to severance benefits does not negate this interpretation of the Plan as set forth in its plain terms. That handbook provision states, "*Eligible* employees will receive [severance benefits] when their job is eliminated." Compl. Ex. 1. The plaintiffs argue that this means any employee whose job is eliminated is entitled to severance benefits, regardless of the terms of the Plan. Snap-on takes a more reasonable view and interprets the word "eligible" in that document to mean "entitled to benefits," not "eligible to be considered for benefits," and looks to the Plan to determine who is so entitled. To read the handbook, as the plaintiffs urge, to mean that any employee who is eligible *for consideration* under the Plan – that is, who is a full-time, non-officer employee in the United States and not covered by a collective bargaining agreement, *see* Compl. Ex. 2, Plan at SEV-1 – is also entitled to severance benefits, even if he is offered other employment with Snap-on, would conflict with the clear purpose and language of the Plan. The Plan is clearly intended only to provide severance benefits to those who were terminated from employment at Snap-on's initiative or direction with no comparable employment offer or actual alternative employment from Snap-on. For these reasons, the Court finds that Snap-on's interpretation of the Plan and its relation to the July 2001 handbook material is not arbitrary or capricious.

Under the foregoing understanding of the Plan, it is clear that Moore and Cunningham have no arguable claim to severance benefits and therefore have no standing to sue under ERISA. An employee who voluntarily elects to leave employment knowing that severance benefits are only available if his employer initiates or directs the termination has no chance of success and therefore has no standing to sue. *Sallee v. Rexnord Corp.*, 985 F.2d 927, 929 (7th Cir. 1993). Ross, on the other hand, has a non-frivolous claim to severance benefits and

11

therefore has standing to sue under ERISA. The Court explains each of the plaintiffs' situations separately.

      1.     <u>Moore</u>

No reasonable fact-finder could conclude that Snap-on's decision to deny Moore severance benefits was arbitrary and capricious. In fact, his claim to such benefits is frivolous because the evidence clearly shows that he voluntarily left employment at Snap-on knowing that severance benefits would only be available if Snap-on initiated or directed his termination without offering or providing him other employment.

Moore's original position at the Mt. Carmel plant was eliminated by Snap-on in the summer of 2003. However, Snap-on offered, and Moore accepted, another position at the Elizabethton Snap-on plant. It was not unreasonable for Snap-on to view this job offer and acceptance as foreclosing the possibility that Moore might qualify as "separated" under the Plan. Similarly, when Moore's job at the Elizabethton plant ended, Snap-on offered Moore a position there, which Moore declined, and allowed Moore to return to work at the Mt. Carmel plant.

As for Moore's actual departure from Snap-on on October 17, there is simply no evidence to show that his departure was initiated or directed by Snap-on such that it would qualify as a "separation" under the Plan. Moore asserts that Stone's September 26 e-mail constituted a commitment on behalf of Snap-on to accept any and all offers by employees to be terminated on October 17 and to provide severance benefits for all those employees making such offers. Thus, Moore believes that his volunteering for early termination was equivalent to an actual termination at Snap-on's initiation or direction. Snap-on, on the other hand, views the e-mail as essentially a solicitation for volunteers to be terminated from which Snap-on would choose who it would actually terminate on October 17. It relies primarily on the statement in the

e-mail that "individual requests may be denied based on current/future staffing, job skill and production requirements" to argue that the e-mail was not an unconditional commitment to terminate all volunteers and provide them severance benefits. Compl. Ex. 6.

The Court finds that Snap-on's interpretation of the e-mail is the only reasonable interpretation in light of its plain language. Furthermore, Snap-on's view that the Plan does not cover an employee who offers to be terminated pursuant to the e-mail, but is not actually terminated by Snap-on, is a reasonable interpretation and application of the Plan. Thus, Snap-on's decision to deny Moore severance benefits based on his unaccepted offer to be terminated was not arbitrary or capricious.[2]

Moore and the other plaintiffs also argue that they were terminated on the day Snap-on informed them the plant would be closing. In support, they cite *Delaware State College v. Ricks*, 449 U.S. 250 (1980), a case dealing with time limits in employment discrimination cases. That case is inapplicable to claims for benefits under ERISA and conflicts with the express terms of the Plan, which provide that an employee's separation date "shall be *the effective date* of the termination of an employee's employment." Compl. Ex. 2, Plan at SEV-6 (emphasis added). Again, Snap-on was reasonable to decide that the notification of the plant closure did not constitute a "separation" qualifying employees for severance benefits.

Finally, this is not a case like *Dulany Foods, Inc. v. Ayers*, 260 S.E.2d 196 (Va. 1979), in which an employer promised employees severance benefits if they continued working until the plant closed and then declined to award those benefits, claiming that they were a gratuitous

---

[2]To the extent that the plaintiffs argue that the e-mail was a modification to the Plan, the issue is irrelevant. The e-mail does not purport to change the Plan's provision that only those terminated at Snap-on's initiative or direction are entitled to severance benefits.

promise unsupported by consideration. This case is easily distinguishable. First, *Dulany Foods* was decided based on state contract law. The issues in *Dulany Foods* are now clearly covered by ERISA, not state contract law, so *Dulany Foods* is of little precedential value. Furthermore, the severance plan in *Dulany Foods* differed in substantial ways from the Plan at issue in this case. Finally, even if *Dulany* provided the rule of law, in this case, Snap-on has not repudiated the Plan; it has simply found that Moore and the other plaintiffs are not qualified for severance benefits under the Plan.

There is one final wrinkle in the chain of events that warrants some explanation. Moore states in his affidavit that Dalton told him he was not entitled to severance benefits because he had already obtained an employment offer elsewhere. This is tantamount to adding a new condition to the Plan – that employees are only eligible to receive severance benefits if they have not obtained other employment – that is not contained in the Plan. It is true that a plan administrator cannot impose new requirements on a plan participant that are not in the plain language of the Plan. *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 831 (7th Cir. 2004). It is arbitrary and capricious for a plan administrator to add new conditions precedent to the award of benefits. *Id.* (citing *Swaback v. American Info. Techs. Corp.*, 103 F.3d 535, 542 (7th Cir. 1996)). However, the new condition added by Dalton is immaterial to this case since Moore's termination did not qualify as a "separation" in the first place. If, in fact, Moore had been terminated in a way that qualified as a "separation" under the Plan, and then Snap-on had denied him severance benefits because he had obtained other employment, he would have had a valid claim that Snap-on arbitrarily and capriciously interpreted the Plan. That is not the case, however, since Moore's termination did not otherwise qualify him for severance benefits.

For these reasons, the Court finds that Moore's claim to severance benefits is frivolous

and that, as a consequence, he is not a "participant" with standing to sue under ERISA. For this reason, the Court will dismiss Moore's claims in count 1 for lack of jurisdiction.

3. Cunningham

Similarly, Cunningham has no arguable claim that he is entitled to severance benefits. The evidence, even viewed in Cunningham's favor, shows that Cunningham, not Snap-on, initiated his departure from the company on February 18, 2004. Thus, that departure does not qualify as a "separation" under the Plan, and Snap-on was not arbitrary or capricious in so deciding. Cunningham's claims to the contrary are frivolous. As a consequence, he is not a "participant" under ERISA and has no standing to sue under that statute. Cunningham's claims in count 1 will also be dismissed for lack of jurisdiction.

2. Ross

Ross presents a different situation. In Ross's case, there is evidence to show that in Ross's meeting with Stone and Dalton on October 17, 2003, Snap-on extended an unconditional affirmative offer to terminate Ross in the following weeks and that on November 8, Ross accepted that offer and Snap-on terminated him, effective two weeks later. Thus, it is possible, viewing the evidence in Ross's favor, that his departure from Snap-on was initiated or directed by Snap-on such that he was entitled to severance benefits under the Plan. Thus, under those circumstances, any interpretation or application of the Plan that denied Ross severance benefits was arbitrary and capricious. Because it appears at this time that Ross has an arguable claim to severance benefits, it also appears that he has standing to assert the ERISA claim in count 1, and because there is a genuine issue of material fact regarding whether the result of the October 17 meeting was a termination by Snap-on or a resignation by Ross, the Court cannot grant summary judgment on Ross's benefits claim in count 1.

It is important to note that the Court's ruling does not rest on a finding of any modification to the Plan by anything Stone or Dalton said. Indeed, it is clear that parties cannot orally modify plans covered by ERISA. 29 U.S.C. § 1102(a)(1); *Sandstrom v. Cultor Food Sci., Inc.*, 214 F.3d 795, 797 (7th Cir. 2000); *Coker v. Trans World Airlines*, 165 F.3d 579, 585 (7th Cir. 1999). The Court's ruling is instead premised on a factual dispute about what occurred in a closed-door meeting – essentially, whether Ross said, "I quit," or Snap-on said, "You're fired," – and what Snap-on knew when it made its benefits determination with respect to Ross. The answer to these critical questions, which will be decided by the Court at trial, will determine whether Snap-on's denial of severance benefits to Ross was arbitrary and capricious under the Plan in its unmodified form.

Neither does the Court's ruling rest on any sort of estoppel theory. An ERISA plaintiff can only raise an estoppel-based claim for benefits where the plan documents are ambiguous and an agent of the plan, or someone with authority to interpret the plan, makes oral misrepresentations. *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 588 (7th Cir. 2000). Courts "simply have rejected the claim that 'bad advice delivered verbally entitles plan participants to whatever the oral statement promised, when written documents provide accurate information.'" *Id.* at 586 (quoting *Frahm v. Equitable Life Assurance Soc'y of the U.S.*, 137 F.3d 955, 961 (7th Cir. 1998)). In this case, there is no ambiguity in the Plan, and if Ross is ultimately found to be entitled to severance benefits, it will not be because Stone or Dalton told him he would get them. It will be because he is entitled to them under the plain, unambiguous terms of the Plan, that is, because Snap-on terminated him in qualifying "separation." Again, this is an issue that will be resolved by the Court at trial.

For these reasons, the Court will deny Snap-on's motion for summary judgment as it

applies to Ross's claim for benefits contained in count 1. Also remaining in this case are Ross's claims under ERISA for breach of fiduciary duty in violation of 29 U.S.C. § 1104(a)(1) and discrimination in violation of 29 U.S.C. § 1140. Snap-on has not addressed those claims in its motion for summary judgment.[3]

    A.    <u>ERISA Preemption of State Law Claims</u>

Counts 2 through 7 of this case are preempted by ERISA and must therefore be dismissed.

To achieve uniform nationwide standards for employee benefit plans, one of the goals of ERISA, the statute contains a broad preemption provision that forecloses certain state law claims that are "relates to" a plan governed by ERISA:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to any employee benefit plan* described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

ERISA § 514(a) (emphasis added), codified at 29 U.S.C. § 1144(a); *see Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990); *Shaw v. Delta Air Lines*, 463 U.S. 85, 99 (1983).[4] A state law is considered to "relate to" an employee benefit plan if it "has a connection with or reference to such a plan" even if it is not specifically designed to affect the plan, does not have a

---

[3] At this point it appears that the Court has jurisdiction to decide the remaining claims in this case, Ross's ERISA claims as federal questions properly removed under 28 U.S.C. § 1441(a), and the plaintiffs' state law claims properly removed under 28 U.S.C. § 1441(c).

[4] There are some express exceptions to this broad preemption provision such as, for example, state laws regulating insurance, banking, or securities and generally applicable state criminal laws. ERISA §§ 514(b)(2)(A) and (b)(4), codified at 29 U.S.C. §§ 1144(b)(2)(A) and (b)(4). None of those exceptions apply in this case.

direct effect on the plan, and is completely consistent with ERISA's substantive requirements. *Ingersoll-Rand*, 498 U.S. at 139 (internal quotations omitted). While subsequent case law has tightened the interpretation of the phrase "relate to," *see De Buono v. NYSA-ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 814 (1997); *California Div. of Labor Stds. Enforcement v. Dillingham Constr.*, 519 U.S. 316 (1997); *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995), it remains clear that "[t]he requisite connection exists under § 514(a) if a law . . . provides alternative enforcement mechanisms" to § 502(a) of ERISA, which contains a comprehensive enforcement scheme and which Congress intended to be the "exclusive vehicle" for actions by plan participants asserting claims for benefits. *Administrative Comm. of Wal-Mart Stores, Inc. Assocs' Health & Welfare Plan v. Varco*, 338 F.3d 680, 689-90 (7th Cir. 2003) (citing *Travelers*, 514 U.S. at 658), *cert. denied*, 542 U.S. 945 (2004); *see Ingersoll-Rand*, 498 U.S. at 144; *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 52 (1987).

  In counts 2 through 7 of this case, the plaintiffs are essentially making state law claims to obtain benefits they believe are due them under Snap-on's ERISA-covered severance plan, a subject that is a fundamental concern of ERISA. *See Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 778-79 (7th Cir. 2002). Thus, at a minimum, Ross is attempting to use the state laws as "alternative enforcement mechanisms" to obtain benefits he believes are due under a plan covered by ERISA, and Ross's state law claims therefore "relate to an employee benefit plan" within the meaning of § 514(a). Thus, those claims are preempted by ERISA and must be dismissed. With respect to the state law claims brought by Moore and Cunningham, Snap-on has not convinced the Court that those claims are preempted in light of those plaintiffs' lack of standing to sue under ERISA. For that reason, the Court will not dismiss those claims at this

time.

For these reasons, the Court will grant Snap-on's motion for summary judgment on Ross's claims in counts 2 through 7 and will dismiss those claims with prejudice.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Snap-on's motion for summary judgment (Doc. 24).  The motion is **GRANTED** to the extent it seeks dismissal of Moore's and Cunningham's claims in count 1 and those claims are **DISMISSED for lack of jurisdiction.**  The motion is **GRANTED** to the extent that it seeks dismissal of Ross's claims in counts 2 through 7 and those claims are **DISMISSED with prejudice**.  The motion is **DENIED** to the extent that it seeks to dismiss Ross's claims in count 1 and Moore's and Cunningham's claims in counts 2 through 7.  The Court **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:  November 29, 2005**

                                        s/ J. Phil Gilbert
                                        **J. PHIL GILBERT**
                                        **DISTRICT JUDGE**